CHARLES E. BRUNDAGE, INDIVIDUALLY AND AS TRUS-
TEE FOR THE CHARLES E. AND EDNA T. BRUNDAGE
CHARITABLE SCIENTIFIC AND WILD LIFE CONSERVA-
TION FOUNDATION, PLAINTIFF-APPELLANT, AND
EILEEN H. CARR, PLAINTIFF-INTERVENOR-APPEL-
LANT, v. THE NEW JERSEY ZINC COMPANY, A NEW
JERSEY CORPORATION, *ET AL.*, DEFENDANTS-RE-
SPONDENTS.

Argued November 7, 1966—Decided January 23, 1967.

452

Mr. *Elmer J. Bennett* argued the cause for appellants (*Messrs. Carpenter, Bennett & Morrissey,* attorneys; *Miss Virginia D. Fenton,* on the brief).

Mr. *William L. Dill, Jr.* argued the cause for The New Jersey Zinc Company, *et al.* (*Messrs. Stryker, Tams & Dill,* attorneys; *Messrs. Covington & Burling* of Washington, D. C., of counsel).

Mr. *Donald B. Kipp* argued the cause for Gulf & Western Industries, Inc., *et al.* (*Messrs. Pitney, Hardin & Kipp,* attorneys; *Messrs. Strasser, Spiegelberg, Fried & Frank* of New York City, of counsel).

*Messrs. Jeffers & Mountain,* attorneys for Harold U. Zerbe (*Messrs. Pomerantz, Levy, Haudek & Block* of New York City, of counsel).

The opinion of the Court was delivered by

JACOBS, J. The Chancery Division dismissed the plaintiff Brundage's complaint seeking to enjoin a proposed merger of defendant The New Jersey Zinc Company (Zinc), a New Jersey corporation, into Gulf & Western Industries, Inc. (G & W), a Michigan corporation. A notice of appeal to the Appellate Division was filed without any accompanying application for a stay and the merger was consummated. We certified the matter before argument in the Appellate Division.

Zinc had a 16-man board of directors composed of two equal factions. One group had been designated by Mr. Jacob Hain, an investment adviser who together with his associates owned or controlled a majority of the Zinc stock. The second group included Mr. R. L. McCann, president of Zinc and chairman of its executive committee, and other directors representing management. A conflict arose between McCann's group which wanted to use corporate funds for expansion and diversification and the Hain group which wanted to increase the corporation's investments in securities. The defendant Harold U. Zerbe, although a member of the Hain group, sided with the management group and the dispute came to a head in August 1965 when Zerbe voted to fill a board vacancy with a nominee of McCann rather than Hain. At this point Hain offered to buy Zerbe's 61,000 Zinc shares at $35 per share. In response to an inquiry from Zerbe, Hain indicated that he and his group might be willing to sell their block of about 2,200,000 Zinc shares at $35 per share if a buyer could be found.

On August 18 and following his conversation with Hain, Zerbe called on Mr. Charles G. Bluhdorn, chairman of the board of G & W. Zerbe was then a director of G & W as well as Zinc. His stockholdings in G & W were worth $670,000

whereas his stockholdings in Zinc were worth $2,300,000. After some discussion, Bluhdorn indicated that G & W might be interested in purchasing the Hain block of Zinc stock provided Zinc management would approve. Zerbe told McCann about this and McCann expressed interest. On August 26 a meeting was held between Bluhdorn and Mc-Cann, and on September 8 a further meeting was held. This latter meeting was attended by all of Zinc's non-Hain directors, many of Zinc's department heads, and several representatives of G & W. There was extensive questioning and satisfying responses with respect to G & W's attitudes towards expansion, research, diversification, sales, employee relations and other matters of management interest.

During the period of these meetings, G & W was also in the process of negotiating with the Hain group for the purchase of its block of Zinc stock. Zerbe was the intermediary in the negotiations. After his conversation with Bluhdorn, he told Hain about G & W's interest in purchasing the Zinc stock at $35 per share and Hain told him that he would have to discuss the matter with Morris Shilensky, a member of the Hain group. Shilensky was on the board of directors of Zinc and was counsel to Bush Terminal Co. Hain was the major stockholder and chairman of the board of Bush Terminal which owned 758,000 shares of Zinc stock. Shilensky told Zerbe that the $35 price was too low and that the Bush people would not sell under $40 per share. After further negotiations, G & W expressed its willingness to pay $40 per share and on September 10, G & W entered into an agreement with Bush Terminal for the purchase of its 758,000 Zinc shares at $40 per share. The closing price of Zinc stock on that date on the New York Stock Exchange was $38.50 per share. The agreement provided that Bush would furnish a list of other stockholders whose shares might be available and that five Hain directors would resign. From September 17 until early in October, G & W acquired pursuant to the agreement, 2,084,306 shares of stock which represented 57.5% of Zinc's capital stock. G & W financed its purchases of the

Zinc stock by borrowing $83,372,240 from the Chase Manhattan Bank on a demand note.

Shortly after G & W agreed to purchase the Zinc stock it issued a press release announcing the agreement and stating that an offer for an exchange of stock would subsequently be submitted for the approval of the directors of G & W and Zinc "leading to an amalgamation of the two companies." On September 16 there was a meeting between representatives of G & W and Zinc and at that meeting McCann is said by Zerbe to have insisted that on merger the minority stockholders of Zinc should receive somewhat more than the $40 per share paid to the Hain group. In August, G & W had consulted Kidder, Peabody & Co., Incorporated, a well-known investment banking concern, and had asked it to submit a proposal which would be fair and equitable to Zinc minority stockholders and would result in their receiving a security worth at least $40 for each Zinc share. Kidder, Peabody proposed a new series B cumulative convertible preferred stock with a $3.50 annual dividend redeemable after 5 years. The exchange ratio contemplated that Zinc shareholders would receive .4125 of the convertible preferred for each share of Zinc common stock. The ratio by which the G & W preferred could be converted into common would be based on 112.5% of the price of the common at the time the conversion rate was established.

On September 29 there were lengthy meetings of Zinc's executive committee and board of directors. Kidder, Peabody representatives explained their proposal and supported their view that it was fair and equitable to Zinc minority shareholders. McCann objected to the .4125 exchange ratio and suggested that it be raised to .430. After discussion with Bluhdorn and over objection voiced by the treasurer of G & W, the ratio was fixed at .425. Zerbe and Mr. Ellison, a member of Zinc's board and a partner in the law firm of Covington & Burling, had strongly supported McCann in obtaining the increased exchange ratio.

At the board meeting on September 29, five of the Hain directors resigned and Bluhdorn along with two other G & W representatives was elected to the Zinc board. Mr. Passino, the head of Zinc's research department, was also elected to the board and the fifth vacancy remained unfilled. Zerbe states that McCann turned down Bluhdorn's request that the fourth directorship be filled by another G & W representative rather than Passino. At this point, G & W had three members on the board not including Zerbe who was on both boards. A resolution adopted by the Zinc board on September 29 approved the basic terms of the proposed merger of Zinc into G & W and directed that the Zinc officers prepare the necessary documents, subject to final approval by the Zinc board prior to submission of the merger for vote by the stockholders.

At the September 29 meeting Ellison had also objected to the Kidder, Peabody formula insofar as it provided that the privilege of converting the preferred stock into G & W common would be based on a percentage of the average price, without any ceiling, during the two-week period following the mailing of the proxy statement. He was concerned that a sharp rise in G & W common after the mailing of the proxy would significantly reduce the number of shares to the Zinc minority on conversion and he suggested that a ceiling be incorporated in the formula. He was supported on this by McCann and Zerbe, and several days after the September 29 meeting, McCann and Bluhdorn agreed on a modification which provided for an $80 ceiling and a $65 floor on G & W common stock for purposes of the conversion. Although the $65 floor protected G & W in the event of a sharp decline in its common stock, it was anticipated that the G & W common would go up sharply rather than decline. This ultimately proved to be the case for the average price during the two-week period following the mailing of the proxy was $92.72 per G & W common share and the modification which resulted in the inclusion of the $80 ceiling is said thus to have entailed an $18 million dollar benefit to the Zinc minority.

At a meeting of the Zinc board on October 29, the change in the formula which incorporated the $80 ceiling and the $65 floor was approved. At the same time communications from White, Weld & Co., a prominent investment banking firm, and Standard Research Consultants, Inc., a well-known management engineering and consultant firm, were presented to the board. These firms had earlier been consulted because the directors of Zinc thought it advisable to have expert opinions by responsible financial concerns other than Kidder, Peabody. White, Weld stated that the new preferred stock would probably have a market value between $95 and $100 a share and Standard Research expressed the view that the probable market value would be between $98 and $100 per share. A subsequent letter from White, Weld set forth its opinion, based on its study of the two companies, that the exchange of securities in the proposed merger was fair and equitable to the Zinc minority stockholders. At the October 29 meeting the Zinc board voted to recommend the proposed merger to the stockholders on the basis of a legal opinion from Covington & Burling that the exchange and conversion of the company's common stock would be a tax-free transaction; apparently it was decided not to await a formal ruling from the Internal Revenue Service because of the fear of extensive delay.

On November 24, a further meeting of the Zinc board was held. It was attended by all of the directors, except one who was excused, and by several other persons including two members of Covington & Burling and Zinc's comptroller and counsel. A proposed amendment of Zinc's certificate of incorporation was adopted as was a proposed form of agreement of merger with G & W and a proposed notice of stockholders' meeting and proxy statement. The amendment of the certificate of incorporation was designed to broaden Zinc's corporate objects so as to conform with those of G & W. The approval of the agreement of merger in the form submitted was subject to such changes and modifications not materially affecting its substance as might be deemed advisable by coun-

sel and approved by the directors executing the agreement. The officers of the company were directed to file the notice of stockholders' meeting and proxy statement with the Securities and Exchange Commission and to make such changes as might be requested by the Commission or might be deemed advisable by counsel.

On or about November 30, 1965 the agreement of merger was signed by the companies. Thereafter G & W made arrangements for the refinancing of its demand loan from the Chase Manhattan Bank; a group of institutional investors agreed to purchase G & W's long term notes in the sum of $100,000,000 provided the merger was consummated by April 1, 1966. Under date of December 27 McCann addressed a letter to Zinc stockholders notifying them that a special meeting would be held on January 26, 1966 to consider and take action upon the proposed merger with G & W. Accompanying the letter were a notice of the meeting, a proxy statement, the proposed amendment to Zinc's certificate of incorporation, and a form of proxy. The proxy statement had been submitted to the Securities and Exchange Commission and changes suggested by its representatives had been incorporated.

Pursuant to the agreement Zinc was to be merged into G & W as the surviving corporation. Each share of Zinc stock, except those owned by G & W which were to be cancelled, was to be exchanged for .425 shares of a new series B preferred stock of the surviving corporation. Each of the new preferred shares was to be entitled to a $3.50 cumulative annual dividend and upon liquidation would be entitled to a preference of $100 plus accumulated dividends. The preferred shares would not be subject to redemption for 5 years but thereafter each could be redeemed at $100 plus accumulated dividends. Each preferred share, at the option of the holder, could be converted at any time into G & W common. In his letter of December 27, McCann advised that each share of preferred would be convertible into G & W common at the rate of not less than 1.25 nor more than 1.538, de-

pending on the average market price of G & W common during the two-week period following the mailing of the proxy. On January 11, 1966 he advised the Zinc stockholders that the average market price for that period was $92.72 and that the exact rate of conversion was 1.25 shares of G & W common for each preferred share.

On January 14, 1966 the plaintiff Brundage, a Zinc stockholder, filed his complaint seeking to enjoin the proposed merger of Zinc into G & W. He alleged that unanimous consent of the stockholders of Zinc was required, that the proposed amendment of Zinc's certificate of incorporation was improper, that the proposed merger would deprive him of his contractual and property rights and impair the value of his investment, and that it constitutes "an inequitable, unlawful and unconscionable scheme of the defendant G & W as majority stockholder of Zinc to appropriate the rights and property of plaintiff as a minority stockholder." On January 22, 1966, Eileen H. Carr, a Zinc stockholder, was permitted to intervene as a plaintiff and thereafter she rested entirely on the plaintiff Brundage's showing. The trial court permitted the January 26 meeting to proceed but enjoined any additional steps towards consummation of the merger, pending its further order.

At the January 26 meeting a vote was first taken on the amendment of Zinc's certificate of incorporation. The amendment was approved and the meeting was adjourned until the amended certificate was filed with the Secretary of State of New Jersey. The meeting was then resumed and a vote was taken on the merger agreement. The eligible shares totaled 3,636,350; the total vote was 3,317,143 of which 3,208,785 voted for and 108,358 against the merger. Excluding the 2,084,306 shares owned by G & W, 1,232,837 shares voted; of these non–G & W shares 1,124,479 (91.2%) voted in favor and 108,358 (8.8%) against the merger.

In February 1966 a five-day trial was held before Judge Waugh who at its close rendered a full opinion dismissing the complaint. He made various legal and factual determina-

tions adverse to the position of the plaintiff Brundage. He held that a two-thirds vote of Zinc stockholders was sufficient (see *R. S.* 14:12–3) under our present merger statute which he determined to be validly applicable to Zinc though it was incorporated in 1880 when no comparable merger statute was in effect. He also determined that there was nothing improper in amending Zinc's certificate to enlarge its corporate objects for the purpose of satisfying the merger requirements of *R. S.* 14:12–1. He saw nothing materially false or misleading in the proxy statement, particularly in the light of its alteration to meet suggestions from the representatives of the Securities and Exchange Commission, and the fact that it contained all the information on which the plaintiff Brundage's presentation was based.

Judge Waugh determined that the proposed merger was not unlawful, inequitable or unconscionable as charged by the plaintiff Brundage and found explicitly that the Zinc minority stockholders were being treated fairly. He concluded his opinion with the following recapitulation of the reasons supporting his factual findings and his judgment in favor of the defendants:

"(a) The purchase of control at $40 per share was an arm's length transaction; (b) the merger procedures were regular and the Zinc board acted in good faith as reasonable men. They acted in good faith on the advice of qualified financial advisors; (c) Zinc minority stockholders are treated fairly no matter which stock they choose to accept—preferred or common; (d) All conflicts of interest were fully disclosed to the stockholders prior to the merger vote; (e) The proxy statement was not false or misleading; (f) The right of appraisal in accordance with statute is available to dissenters; (g) The price being paid for the stock supports the expert opinion of market value of stock given Zinc minority."

The Chancery Division's dismissal of the complaint was on February 23, 1966. On the same day a notice of appeal to the Appellate Division was filed but was not accompanied by any application for a stay. On February 25, the merger was consummated. G & W as the surviving corporation issued its new securities pursuant to the merger

agreement and the securities have been listed and are being actively traded on the New York Stock Exchange. Based on these circumstances, the defendants moved before the Appellate Division to have the appeal dismissed as moot but the issue was reserved until the hearing of the appeal. At oral argument before us, counsel for the plaintiffs acknowledged that the determination not to apply for a stay was a deliberate one. As he saw it, the choice was a very high bond or a very early hearing of the appeal on the one hand or, on the other hand, reliance on the court's inherent jurisdiction to restore the *status quo* in the event it is determined that the defendants improperly proceeded with the merger. The latter course was chosen and it is urged before us that the defendants should not be permitted to render the proceedings moot by their own voluntary action taken with full awareness of the pendency of the appeal. While we agree that the appeal may not be deemed moot, we believe that the changes and intervening third party interests may rightly be considered, along with all other factors in the case, in reaching a sound determination as to whether equitable considerations now call for complete undoing of the merger, as the plaintiffs seek.

When the proceeding was in the Chancery Division it was tried very speedily because, as Judge Waugh said in his opinion, "the parties desire a judgment of this Court so that any necessary appeals may be advanced and hopefully heard prior to the date of April 1, 1966." When the judgment of dismissal was entered on February 23, the plaintiffs could readily have applied for a stay. *R. R.* 1:4–6 provides that "The grant or denial of a stay and the extent, terms, and conditions thereof are matters resting in the discretion of the court from which the appeal is taken, or to which certification is sought, or the appellate court, to be exercised with proper regard to the particular circumstances in each case." If the plaintiffs had made timely application to us for early hearing with interim stay without bond, their application would undoubtedly have been granted.

It is clear to us that, in the interests of complete justice to all concerned, the plaintiffs should have made such application rather than have relied on their notice of appeal and hearing in ordinary course. But this does not mean that we are at all in sympathy with the defendants' unseemly haste in consummating their merger on the second day after the entry of the judgment of dismissal and the taking of the appeal. When it became evident to them that the plaintiffs were not applying for early appellate hearing they could easily have made such application on their own. There had been a full trial below, the entire record was available, and there was no reason why under our modern flexible practice there could not have been a final appellate determination well within the April 1 deadline of the financial commitment. *Cf. Richardson v. Caputo,* 46 *N. J.* 3, 6 (1965) ; *Campi v. Aikins,* 43 *N. J.* 319, 320 (1964).

There have been many decisions, particularly in the federal courts, which bear on the matter. Some of them have taken the position that where the plaintiff is denied injunctive relief against a proposed merger and takes an appeal without applying for a stay, his appeal may be dismissed as moot upon a showing that the merger has been consummated. See *Sobel v. Whittier Corp.,* 195 *F. 2d* 361 (6 *Cir.* 1952); *Kelaghan v. Industrial Trust Co.,* 211 *F. 2d* 134 (1 *Cir.* 1954) ; *cf. Brill v. General Industrial Enterprises,* 234 *F. 2d* 465 (3 *Cir.* 1956) ; *Hazzard v. Westview Golf Club, Inc., M.,* 217 *A. 2d* 217 (1966). Others have taken the position that the defendants' consummation of the merger during the pendency of the appeal is at their own peril and does not render the appellate proceeding moot. See *Ramsburg v. American Investment Company of Illinois,* 231 *F. 2d* 333 (7 *Cir.* 1956) ; *Subin v. Goldsmith,* 224 *F. 2d* 753 (2 *Cir.*), *certiorari* denied 350 *U. S.* 883, 76 *S. Ct.* 136, 100 *L. Ed.* 779 (1955) ; *cf. Black v. Delaware & Raritan Canal Co.,* 24 *N. J. Eq.* 455, 482–483 (*E. & A.* 1873).

The opinions in *Sobel* and *Ramsburg* are illustrative of the differing approaches. In *Sobel* the court stressed the failure

to apply for a stay and the intervening rights of third parties and summarily concluded that since the plaintiff sought only to restrain the merger and failed to "take any steps to preserve the existing status pending appeal," the carrying out of the merger rendered the appeal moot. 195 *F. 2d*, at *p.* 363. In *Ramsburg* the plaintiff sought a temporary injunction restraining a proposed merger of the Domestic Financing Corporation into the American Investment Company. His application was denied at the trial level, an appeal was taken, and during its pendency the defendants consummated the merger. In rejecting the contention that the merger consummation rendered the appeal moot, the court said:

"The chronology of the circumstances involved in the case at bar indicates that this may be a proper case for a mandatory injunction to restore the *status quo*. The order denying the temporary injunction was subject to plaintiffs' right to perfect a timely appeal. This they have done. It now appears that defendants completed the merger against which the injunction was sought on, or about, the same day the appealed order was entered. We have jurisdiction of the parties and of the subject matter, *i. e.*, the assets of Domestic, which are in the possession and control of American as the surviving corporation; and we have the power to compel a restoration should our ultimate determination be that the circumstances of the case require that result. The appeal, therefore, is not moot." 231 *F. 2d*, at *p.* 338.

We agree for the reasons set forth in *Ramsburg* that consummation of a merger during the pendency of an appeal, as here, does not render the appeal moot and that where the circumstances equitably call for such action the court may order the merger undone. See *Porter v. Lee,* 328 *U. S.* 246, 251, 66 *S. Ct.* 1096, 90 *L. Ed.* 1199, 1203 (1946); *cf. Lieferant v. Bartell, 36 Misc. 2d* 477, 232 *N. Y. S. 2d* 1003, 1006 (*Sup. Ct.* 1962). The plaintiffs had the undoubted right to an appeal and they took it in timely fashion. Although they also had the right to seek a stay, there is nothing in the terms or the underlying purposes of our practice rules to suggest that upon failure to do so the defendants may by their own voluntary action render the appeal wholly fruitless. Nonetheless, we are satisfied, as we

have hereinbefore indicated, that in the circumstances at hand the plaintiffs should have applied for a stay and early hearing, and while they remain at liberty to seek what would now amount to mandatory injunctive relief we may, in weighing all of the equities, properly bear in mind the consummation of the merger with its intervening interests and the very heavy burdens of its undoing as relevant factors. *Cf. Sautto v. Edenboro Apartments, Inc.,* 84 *N. J. Super.* 461 (*App. Div.* 1964), certif. denied 43 *N. J.* 353 (1965), where the court invoked the equitable doctrine of relative hardship in declining to direct the tearing down of a large apartment house which, in the absence of any application by the plaintiff for interim restraint, had been constructed by the defendant during the course of the trial and appellate litigation. See *Gilpin v. Jacob Ellis Realties, Inc.,* 47 *N. J. Super.* 26 (*App. Div.* 1957).

We come now to the plaintiffs' contention that unanimous consent rather than a two-thirds vote of Zinc's stockholders was required. The plaintiffs do not attack New Jersey's present merger statute (*R. S.* 14:12–1 *et seq.*) under which a two-thirds vote is clearly sufficient (*R. S.* 14:12–3) and under which dissenting stockholders are given broad appraisal rights liberally interpreted by the courts. *R. S.* 14:12–7; *Bache & Co. v. General Instrument Corp.,* 42 *N. J.* 44 (1964); *Jaquith & Co. v. Island Creek Coal Co.,* 47 *N. J.* 111 (1966). However, they do urge that the statute has no proper application here because Zinc was incorporated in 1880 before the passage of New Jersey's first merger enactment. That enactment authorized the merger of corporations "organized or to be organized under any law or laws of this state." *L.* 1893, *c.* 67, *p.* 121. Language of similar pervasive import was contained in the general corporation act of 1896 (*L.* 1896, *c.* 185, *p.* 309), in the compiled statutes of 1910 (2 C. S. *p.* 1659), and in *L.* 1918, *c.* 271, *p.* 1013 and *L.* 1929, *c.* 261, *p.* 478. Although there was some rephrasing in the revised statutes of 1937 (*R. S.* 14:12–1), there was clearly no departure from the long-standing legislative purpose of

making the merger provisions applicable to pre-existing as well as future corporations. *Cf. Samuel D. Wasserman, Inc. v. Klahre,* 24 *N. J. Super.* 143, 147 (*App. Div.* 1952). *R. S.* 14:3-3, on which the plaintiffs place reliance, has no significance here; it embodies provision for the corporate exercise of powers incidental to those expressly granted and in nowise negates legislative authority to grant additional corporate powers to be exercised in appropriate manner.

Long before Zinc was incorporated, there was a general statutory reservation subjecting all corporate charters to "alteration, suspension, and repeal, in the discretion of the legislature." *L.* 1846, *p.* 17. This reserved power was placed in our State Constitution in 1875 (*Art.* IV, § VII, *par.* 11) and is found in our present Constitution (*Art.* IV, § VII, *par.* 9). The act of 1875 under which Zinc was incorporated contained the reserved power (§ 6) and a sweeping stipulation (§ 35) that the provisions of the act could be amended or repealed at the pleasure of the Legislature and that every company created under the act "shall be bound by such amendment." See *Revision of the Statutes of New Jersey* (1709–1877), *pp.* 178, 183. Many out-of-state cases have upheld the customary reserved power as constitutionally adequate to sustain the application to pre-existing corporations of later statutes authorizing mergers by less than unanimous votes of stockholders. See *Beloff v. Consolidated Edison Co. of New York,* 300 *N. Y.* 11, 87 *N. E.* 2d 561, 564 (1949); *Barnett v. D. O. Martin Co.,* 191 *Ga.* 11, 11 *S. E.* 2d 210, 214, 131 *A. L. R.* 725 (1940); *Winfree v. Riverside Cotton Mills Co.,* 113 *Va.* 717, 75 *S. E.* 309 (1912); cf. *Coyne v. Park & Tilford Distillers Corp.,* 38 *Del. Ch.* 514, 154 *A.* 2d 893 (1959); see also 15 *Fletcher, Corporations* § 7049, *p.* 37, § 7063, *p.* 64 (*Rev. ed.* 1961); *Ballantine, Corporations* § 290, *p.* 683 (*Rev. ed.* 1946); Annot., "Constitutional and statutory provisions relating to consolidation, merger, or reorganization of corporations as applicable retrospectively to corporation previously chartered," 131 *A. L. R.* 734 (1941).

It is urged that these out-of-state cases do not represent the law of New Jersey in the light of *Zabriskie v. Hackensack and New York Railroad Company,* 18 *N. J. Eq.* 178 (*Ch.* 1867). There a railroad sought to extend its line under the authority of a statutory enactment passed under the reserved power. The Chancellor, rejecting persuasive authority elsewhere (*Durfee v. Old Colony and Fall River Railroad Company,* 87 *Mass.* 230 (1862)), held that the line could not be extended without the unanimous consent of stockholders. This in effect permitted a single stockholder to restrain the railroad's orderly growth and development as authorized by the Legislature and as approved by the corporation's managing directors and majority stockholders. It paid no attention to the overriding public interest and represented a narrow application of an old partnership principle to a new situation involving dissimilar considerations. While the later New Jersey cases have not expressly overruled *Zabriskie,* they have repeatedly recognized that, where justified by the public interest, the reserved power may be invoked to sustain charter alterations though they affect not only the so-called contract between the State and the corporation but also, as in *Zabriskie,* contractual rights between the corporation and its stockholders and among the stockholders *inter se.* See *Berger v. United States Steel Corporation,* 63 *N. J. Eq.* 809, 824 (*E. & A.* 1902); *Murray v. Beattie Manufacturing Co.,* 79 *N. J. Eq.* 604, 609 (*E. & A.* 1912); *Bingham v. Savings Investment & Trust Co.,* 101 *N. J. Eq.* 413, 415 (*Ch.* 1927), affirmed 102 *N. J. Eq.* 302 (*E. & A.* 1928); *In re Collins-Doan Co.,* 3 *N. J.* 382, 391 (1949); *A. P. Smith Mfg. Co. v. Barlow,* 13 *N. J.* 145, appeal dismissed 346 *U. S.* 861, 74 *S. Ct.* 107, 98 *L. Ed.* 373 (1953).

In considering the scope of the reserved power, wide and expanding concepts of the public interest have been applied. Thus in *Murray v. Beattie Manufacturing Co., supra,* the court, in upholding a statute substituting a discretionary power to pay dividends for a pre-existing duty, indicated that the alteration could be sustained without stock-

holder assent since it was a matter of State concern that a corporation be permitted to accumulate a sufficient fund to secure its credit and make permanent its successful operation. *79 N. J. Eq.,* at *p.* 609. In *Bingham v. Savings Investment & Trust Co., supra,* the court upheld a bank merger under the authority of legislation enacted after the incorporation of the bank, with Vice Chancellor Backes pointing out that the office of the reserve power in our law "is to safeguard the public interests in corporate grants." 101 *N. J. Eq.,* at *p.* 415. In *In re Collins-Doan Co., supra,* the board of directors was hopelessly deadlocked and an application was made under *L.* 1938, *c.* 303 for dissolution. It was contended that the 1938 legislation could not be applied to the corporation which had been formed many years earlier. This contention was rejected in an opinion which recognized a public interest in avoiding the continuance of a corporation which could not properly function because of a stalemate in management. 3 *N. J.,* at *pp.* 392–393.

In *A. P. Smith Mfg. Co. v. Barlow, supra,* we dealt with statutes authorizing corporations to make charitable contributions. See *R. S.* 14:3–13, *R. S.* 14:3–13.1 *et seq.* The statutes were passed long after the 1896 incorporation of the company and the issue presented was whether they could constitutionally be applied under the reserve clause to pre-existing corporations. The statutory grant of power clearly affected the contractual relations between the stockholders and the corporation and among the stockholders *inter se,* but it was nonetheless readily sustained as being in the public interest. In the course of our opinion we rejected a suggestion of federal infirmity, saying:

"State legislation adopted in the public interest and applied to pre-existing corporations under the reserved power has repeatedly been sustained by the United States Supreme Court above the contention that it impairs the rights of stockholders and violates constitutional guarantees under the Federal Constitution. Thus, in *Looker v. Maynard,* 179 U. S. 46, 21 S. Ct. 21, 45 L. Ed. 79 (1900), the court sustained the application to pre-existing corporations of later legislation designed to secure minority representation on boards of

directors by permitting cumulative voting by stockholders; in *Polk v. Mutual Reserve Fund Life Association of New York*, 207 U. S. 310, 28 S. Ct. 65, 52 L. Ed. 222 (1907), the court sustained state legislation which permitted reorganizations of existing corporations involving changes in their corporate purposes; in *Veix v. Sixth Ward Bldg. & Loan Association of Newark*, 310 U. S. 32, 60 S. Ct. 792, 84 L. Ed. 1061 (1940), a New Jersey statute which altered the withdrawal rights of building and loan shareholders was upheld; and in *Sutton v. [State of] New Jersey*, 244 U. S. 258, 37 S. Ct. 508, 61 L. Ed. 1117 (1917), a New Jersey statute which required pre-existing street railway corporations to carry police officers without charge was upheld as a proper exercise of the reserve power. Many other instances which sustain legislative enactments adopted in the public interest but affecting the relations between the corporation and its stockholders and between stockholders *inter se*, as well as the contract between the State and the corporation, may be found cited in the opinion below and in *Ballantine, supra, p.* 648; 7 *Fletcher, supra, p.* 815; 54 *Harv. L. Rev.* 1368 (1941); 13 *Am. Jur.* 233 (1938); 16 *C. J. S., Constitutional Law*, § 320, *p.* 759 (1939). We are entirely satisfied that within the orbit of above authorities the legislative enactments found in *R. S.* 14:3–13 and *N. J. S. A.* 14:3–13.1 *et seq.* and applied to pre-existing corporations do not violate any constitutional guarantees afforded to their stockholders." 13 *N. J.*, at *pp.* 159–160.

Although *A. P. Smith* did not expressly overrule *Zabriskie*, it cast such doubt on it as to lead a commentator to the conclusion that the Court had "finally distinguished the *Zabriskie* case to complete extinction"; in his opinion, "this result would be an entirely logical development if only because, from a conceptual point of view, all legislative enactments must be deemed to involve advancement of the public interest" Rubin, "Corporations, 1952–1953 Survey of N. J. Law," 8 *Rutgers L. Rev.* 129, 132 (1953). Judge Waugh noted below that the exercise here of the reserve power was justified by the public interest in providing for orderly corporate growth and development through fair and democratic processes. While we believe this to be entirely sound, we also believe that the time has come for express disavowal of *Zabriskie* as having no proper place in modern corporate law. Its notions as to unanimity may have had some force in the days when commerce was conducted largely through individuals and small partnerships or closely held corporations;

they have no force in today's society of large corporate enterprises such as Zinc and G & W with their thousands of stockholders spread throughout the nation. See Lattin, "Minority and Dissenting Shareholders' Rights in Fundamental Changes," 23 *Law & Contemp. Prob.* 307 (1958).

The power reserved in our organic and statutory law was broadly phrased and broadly intended. It should liberally be viewed as part and parcel of the tripartite arrangements between the State, the corporation and the stockholders (*cf. State, by Furman v. Jefferson Lake Sulphur Co.,* 36 *N. J.* 577, 589, appeal dismissed 370 *U. S.* 158, 82 *S. Ct.* 1253, 8 *L. Ed. 2d* 402 (1962)), and thus viewed, as permitting reasonable corporate charter amendments having legitimate business ends. Under this approach there can be no question with respect to the application here of the two-thirds vote provision of our present merger statute (*R. S.* 14:12-3), bearing in mind not only the broad appraisal rights afforded to dissenters (*R. S.* 14:12-7; *Bache & Co. v. General Instrument Corp., supra,* 42 *N. J.* 44; *Jaquith & Co. v. Island Creek Coal Co., supra,* 47 *N. J.* 111), but also the broad protection afforded to them under the settled and continuing New Jersey doctrine that a merger, even though it complies procedurally with the statutory requirements, must also satisfy basic equitable requirements of good faith and fair treatment. See *Outwater v. Public Service Corp. of N. J.,* 103 *N. J. Eq.* 461, 467-468 (*Ch.* 1928), affirmed 104 *N. J. Eq.* 490 (*E. & A.* 1929); *Bingham v. Savings Investment & Trust Co., supra,* 101 *N. J. Eq.,* at p. 421; *cf.* Vorenberg, "Exclusiveness of the Dissenting Stockholder's Appraisal Right," 77 *Harv. L. Rev.* 1189 (1964); Note, "Limitations on Alteration of Shareholders' Rights by Charter Amendment," 69 *Harv. L. Rev.* 538 (1956); see also *Lattin, Corporations* 511 (1959).

The plaintiffs next contend that there was failure to satisfy the statutory merger requirement that Zinc and G & W be organized for the purpose of carrying on business of "the same or a similar nature." *R. S.* 14:12-1. Before the

stockholders of Zinc voted on the merger, Zinc's certificate was amended, as G & W's had been at an earlier date, to set forth corporate purposes fully meeting the statutory requirement of similarity. In *American Malt Corp v. Board of Public Utility Commissioners,* 86 *N. J. L.* 668 (*E. & A.* 1914), Justice Swayze pointed out that the right to merge is determined not by the business actually carried on but by the business "for which the two are organized." 86 *N. J. L.,* at *p.* 670; *cf. Colgate v. United States Leather Co.,* 75 *N. J. Eq.* 229, 236 (*E. & A.* 1908); *Fletcher, supra* § 7058. And under *R. S.* 14:11–1 *et seq.* the business for which a corporation is organized may be altered at any time in a direct amendment proceeding initiated by the board of directors and approved by the stockholders. *R. S.* 14:11–2. It may be noted that the requirement of stockholders' approval for amendment is two-thirds in interest of each class (*R. S.* 14:11–2) whereas the requirement for merger is two-thirds of all of the corporate stock with each share of stock entitling the holder to one vote *R. S.* 14:12–3.

The practice of amending corporate charters in anticipation of merger has been long-standing and widespread. In *Outwater v. Public Service Corp. of N. J., supra,* Vice Chancellor Backes referred without any adverse implication to the fact that, after the issue of dissimilarity of purpose had been raised, the companies amended their charters and entered into a new merger agreement. 103 *N. J. Eq.,* at *p.* 468. And in *Clarke v. Gold Dust Corporation,* 106 *F. 2d* 598 (3 *Cir.* 1939), *certiorari* denied 309 *U. S.* 671, 60 *S. Ct.* 614, 84 *L. Ed.* 1017 (1940), the Third Circuit upheld the validity of a charter amendment designed to satisfy the statutory requirement. After distinguishing cases such as *Colgate v. United States Leather Co., supra,* 75 *N. J. Eq.,* at *pp.* 236–240, where no direct proceeding for charter amendment to achieve similarity had been initiated, Judge Biggs expressed the view that, so far as New Jersey law is concerned, "there is no statutory prohibition which prevents amendment for the purpose of subsequent merger." 106 *F. 2d,* at *p.* 602.

 The plaintiffs suggest that even though the charter amendment may have satisfied the letter of the statute it evaded its spirit and should therefore be stricken. We do not agree but, on the contrary, subscribe to the position taken in *Clarke*. There is no legislative hostility to mergers as is evidenced by the step by step liberalization of the merger requirements. See *L.* 1893, *c.* 67; *L.* 1918, *c.* 271; *L.* 1929, *c.* 261; *N. J. S. A.* 14:12–1 *et seq.* Nor is there any legislative hostility to the amendment of corporate charters or to the wide diversification of corporate activities. *N. J. S. A.* 14:11–1 *et seq.* Indeed, in the light of modern corporate developments throughout the country, it would be highly surprising to find our Legislature aligned with the restrictive views advanced by the plaintiffs. While the statutory requirement for charter similarity must be honored, we find neither any policy considerations nor any conflicting legislative goals which would move us to hold that there must be more than the literal compliance effected here before the merger was voted on. Even the opinion of Vice Chancellor Jayne in *Imperial Trust Co. v. Magazine Repeating Razor Co.,* 138 *N. J. Eq.* 20 (*Ch.* 1946), relied on so heavily by the plaintiffs, gave recognition at one point to the validity of a pre-merger charter amendment "in a direct proceeding taken in pursuance of the legislative enactment. *R. S.* 14:11–2; *N. J. S. A.* 14:11–2." 138 *N. J. Eq.,* at *p.* 25.

 The plaintiffs argue that the defendants failed to make proper disclosure in their proxy statement and that the merger should be set aside on that ground. In the main their attack bears on (1) the interests of Zerbe and Shilensky, (2) the mode of presentation of the comparative data with respect to earnings and book value, and (3) the trial court's consideration of the fact that the proxy statement had been submitted to the Securities and Exchange Commission. Judge Waugh found that there had been full disclosure in the proxy statement and rejected the plaintiffs' attack in its entirety. He noted that the statement contained a detailed presentation of G & W's purchase of the Zinc stock,

and referred specifically to the interests of Zerbe as a director and stockholder of both G & W and Zinc, and to the interests of Shilensky and others as Zinc directors "who were interested in the sale of shares to G & W, either directly or through associates." He found no basis for questioning the nature of Zerbe's participation as intermediary in the transaction and while he was naturally troubled by a large legal fee received by Shilensky for his efforts in the sale of Zinc stock to G & W, he found that the fee was paid entirely by the sellers and that G & W did nothing "but pay the $40 purchase price for the stock in accordance with the seller's instructions." The record before us would not at all justify disturbing Judge Waugh's findings in this regard or upsetting the merger because the proxy statement did not elaborate on Shilensky's relations with the sellers.

The proxy statement contained comparisons of earnings and book value which the plaintiffs say were misleading. They stress that the $5.08 figure representing *pro forma* net earnings for the year ending July 31, 1965 of G & W before merger included G & W's 57.5% interest in the earnings of Zinc as though the Zinc stock had been acquired by G & W on August 1, 1964. However, that fact appeared from the preceding page and on an earlier page the actual $2.65 earnings of G & W for the period ending July 31, 1965 were set forth without relation to the Zinc earnings. The plaintiffs also stress that although the pre-merger book value of Zinc shares contained no comparable premium, the post-merger *pro forma* book value included the so-called premium of $20,512,000 by which the purchase price paid by G & W for the Hain stock exceeded the value of that stock on the books of Zinc. However, that fact appeared from the proxy statement itself which elsewhere set forth the allocation of the $20,512,000 to various assets of Zinc as explained in footnotes. There was expert testimony that all of the foregoing was in accord with good accounting practice and the plaintiff Brundage, who is a very well versed investment counsel, does not suggest that he was in anywise misled. Indeed, as

Judge Waugh pointed out below, it is significant that all of the figures on which the plaintiff Brundage based his own presentation in support of the allegations in his complaint were embodied within the four corners of the proxy statement.

During the trial, witnesses were permitted to testify that the proxy statement had been submitted to representatives of the Securities and Exchange Commission and that changes had been made in accordance with their suggestions. Judge Waugh recognized that the Commission's participation did not constitute a finding by it that the proxy statement as distributed was not false or misleading. 15 *U. S. C. A.* § 78z. He expressed the thought that in reaching his own independent determination on that issue the submission of the proxy statement to the Commission was not to be ignored. As he put it, quoting from *Eliasberg v. Standard Oil Co.,* 23 *N. J. Super.* 431, 444–445 (*Ch. Div.* 1952), affirmed 12 *N. J.* 467 (1953), "[i]t is a fact to be considered in conjunction with all other facts in the case and without according to the examination by the Commission any element of approval." Other judicial opinions have expressed much the same thought. See *Mack v. Mishkin,* 172 *F. Supp.* 885, 888 (*S. D. N. Y.* 1959); *Dunn v. Decca Records,* 120 *F. Supp.* 1, 2 (*S. D. N. Y.* 1954); *cf.* Loss, "The SEC Proxy Rules in the Courts," 73 *Harv. L. Rev.* 1041, 1066, n. 96 (1960).

We find no prejudicial error in Judge Waugh's treatment of the testimony relating to the submission of the proxy statement to the Commission. Nor do we find any reason for differing with his conclusion that any deficiencies which may have occurred were not such as to warrant the relief sought in the plaintiff Brundage's complaint. As has already been noted, Brundage was not misled and no other Zinc stockholders have urged before us that they were misled. Though we have rejected the plaintiff Brundage's legal attack on the proxy statement, we have little doubt that the statement could well have been so prepared as to have been more readily understandable by the ordinary stockholder.

The defendants take the position that data presented in proxy statements are necessarily "involved and technical" and, as here, would not mislead "a person trained in reading complex financial statements." *Cf. Eliasberg v. Standard Oil Co., supra,* 23 *N. J. Super.,* at *p.* 444; *Shvetz v. Industrial Rayon Corporation,* 212 *F. Supp.* 308, 310 (*S. D. N. Y.* 1960). But as was properly pointed out in the November 20, 1966 issue of the *New York Times,* ordinary investors are too often misled by so-called "generally accepted accounting principles" and by less than forthright statements of comparability in merger proceedings and the like. Apparently there is urgent need for further Commission regulations designed to afford a greater measure of protection to the ordinary stockholder who, though he may have no expertise, reasonably expects to be able to understand proxy statements as well as other corporate communications. *N. Y. Times,* Nov. 20, 1966 § 3, *p.* 1F.

The final and most important question before us is whether the merger was, as the plaintiffs allege, "unfair and inequitable to Zinc minority stockholders." Preliminary thereto is the placing of the burden of proof (persuasion) which, although controverted by the parties, appears to us to rest clearly on the defendants here. In *Geddes v. Anaconda Copper Mining Co.,* 254 *U. S.* 590, 41 *S. Ct.* 209, 65 *L. Ed.* 425 (1921), the Supreme Court expressed the following views to which we readily subscribe:

"The relation of directors to corporations is of such a fiduciary nature that transactions between boards having common members are regarded as jealously by the law as are personal dealings between a director and his corporation; and where the fairness of such transactions is challenged the burden is upon those who would maintain them to show their entire fairness and where a sale is involved the full adequacy of the consideration. Especially is this true where a common director is dominating in influence or in character. This court has been consistently emphatic in the application of this rule, which, it has declared, is founded in soundest morality, and we now add in the soundest business policy. Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 588, 23 L. Ed. 328, [329, 330, 3 Mor. Min. Rep. 688]; Thomas v. Brownville [Ft. K. & P. R.] Co., 109 U. S. 522, 3 Sup.

476

Ct. 315, 27 L. Ed. 1018; Wardell v. [Union P. R.] Co., 103 U. S. 651, 658, 26 L. Ed. 509 [511, 7 Mor. Min. Rep. 144]; Corsicana National Bank v. Johnson, 251 U. S. 68, 90, 40 Sup. Ct. 82, 64 L. Ed. 141 [155]." 254 *U. S.*, at *p.* 599, 41 Sup. Ct., at *p.* 212, 65 *L. Ed.*, at *p.* 432.

See *Pepper v. Litton*, 308 *U. S.* 295, 306, 60 *S. Ct.* 238, 84 *L. Ed.* 281, 289 (1939); *Chelrob, Inc. v. Barrett*, 293 *N. Y.* 442, 57 *N. E.* 2d 825, 834 (1944); *Shlensky v. South Parkway Building Corporation*, 19 *Ill.* 2d 268, 166 *N. E.* 2d 793, 800–801 (1960); 3 *Fletcher, supra* § 974; *Latlin, Corporations, supra* 260; *cf. Masholie v. River Edge Estates, Inc.*, 129 *N. J. Eq.* 228, 231 (*Ch.* 1941); *Solimine v. Hollander*, 128 *N. J. Eq.* 228, 275–276 (*Ch.* 1940); *Robotham v. Prudential Insurance Co.*, 64 *N. J. Eq.* 673, 709–710 (*Ch.* 1903); see also *Marcy v. Guanajuato Development Co.*, 228 *F.* 150 (*D. N. J.* 1915) where Judge Haight, citing judicial opinions in New Jersey and elsewhere, expressed the rule to be that, while the presence of common directors on both sides of a transaction does not give a dissenting stockholder the arbitrary right to avoid the transaction, it does give him the right to subject it to the scrutiny of the court with the burden on those seeking to uphold it "of showing that the transaction is fair and absolutely free from fraud." 228 *F.*, at *p.* 151.

We do not understand the defendants to dispute any of the foregoing; indeed their brief explicitly acknowledges that ordinarily the party seeking to sustain a transaction between companies having common directors "must prove its fairness and the absence of fraud." But they urge that an exception be recognized where, as here, the transaction has received stockholders' approval. In support they rely on *Eliasberg v. Standard Oil Co., supra*, 23 *N. J. Super.* 431, which did not involve the issue of fairness in a merger, and *Bingham v. Savings Investment & Trust Co., supra*, 101 *N. J. Eq.* 413 which, although it did involve the issue of fairness, did not speak in terms of burden of proof. See 101 *N. J. Eq.*, at *p.* 421. In *Outwater v. Public Service Corp. of N. J., supra*,

103 *N. J. Eq.* 461, the same Vice Chancellor who sat in *Bingham* enjoined, as unfair to minority stockholders, a proposed merger between Public Service and several affiliated companies in which it was the majority stockholder. In the course of his opinion, the Vice Chancellor pointed to the burden on the majority of showing fairness and noted that the judgment as to fairness was "not to be influenced by the heavy vote of approval, as it otherwise would be if the vote were independent." 103 *N. J. Eq.*, at *p.* 464. See also *Booth v. Land Filling & Improvement Co.*, 68 *N. J. Eq.* 536, 541 (*Ch.* 1905).

The defendants stress that although at the time of the approval by Zinc's directors and stockholders G & W had three designees on Zinc's board and owned 57½% of Zinc's stock, the other members of Zinc's board acted independently as did the non-G & W Zinc shareholders who voted heavily in favor of the merger. While those circumstances are of course to be weighed along with all of the other factors in the case in reaching a sound determination on the issue of fairness, they do not supply any just reason for shifting the burden of proof. G & W was undoubtedly a dominating influence in putting through the merger. As holder of the majority stock in Zinc on whose board of directors it was represented, it had affirmative fiduciary responsibilities to Zinc's minority stockholders. Its sources of information as to the fairness of the merger terms were undoubtedly more intimate and far greater than those available to the thousands of Zinc minority stockholders who relied heavily, if not entirely, on management's recommendation that the merger was in the best interests of "New Jersey Zinc and all of its Stockholders." In the light of the circumstances, we think it evident that, when challenged as here by a minority stockholder's presentation of facts which could lead to a finding of unfairness, the burden of establishing the fairness of the transaction rested throughout the proceeding on those seeking to uphold the merger. *Cf.* Ward, "Some Notes on Trans-

actions Involving Interested and Interlocking Directors in Pennsylvania," 23 *Temple L. Q.* 107, 112–113 (1949).

In dismissing the complaint, Judge Waugh did not rest on any issue of burden of proof but made his own complete and independent finding that the merger was not inequitable and was fair to Zinc's minority stockholders. In our review we give weight to that finding, particularly since it rests on underlying factual determinations in which matters of credibility were involved. See *Capozzoli v. Capozzoli,* 1 *N. J.* 540, 543 (1949); *Gallo v. Gallo,* 66 *N. J. Super.* 1, 5 (*App. Div.* 1961); *cf. State v. Johnson,* 42 *N. J.* 146, 160–161 (1964); *Lohmann v. Lohmann,* 50 *N. J. Super.* 37, 44–45 (*App. Div.* 1958).

The plaintiffs' attack on the fairness of the merger is based principally on their contention that the Zinc minority has contributed a grossly disproportionate share of the surviving corporation's book assets. The stockholders' equity prior to the merger was $109,000,000 for Zinc and $37,251,000 for G & W. The stockholders' equity in the surviving corporation, as set forth in the proxy statement, is $83,391,000 computed by combining G & W's equity of $37,251,000 and $46,140,000 representing Zinc's minority equity. The plaintiffs contend that the $20,512,000 premium paid by G & W for the Hain stock was improperly included as part of the stockholders' equity in the surviving corporation. Their position is that G & W's contribution should be viewed as only $16,739,000 and that the consolidated stockholders' equity should be viewed as $62,879,000 of which the Zinc minority contributed $46,140,000. On the basis of these calculations they contend that the Zinc minority contributed about 74% of the net assets for which they receive on conversion only 27.2% of the G & W common stock.

The defendants point out that G & W's book equity before its purchase of the Zinc stock was admittedly $37,251,000 and that, after the purchase and at the time of the merger, it remained the same in accordance with familiar accounting principles. They consider the plaintiffs' elimination of the

$20,512,000 premium from G & W's asset contribution to the surviving corporation and the 74% figure based thereon to be improper and the plaintiffs' adverse comparison of the book value per Zinc share before and after the merger to be misleading. Before the merger, each Zinc share had a book value of $30.16. After the merger and the exchange for preferred, the latter had a liquidation and redemption value of $42.50. Upon the conversion of the preferred into common, the book value would be $14.84 although the conversion privilege need not be exercised immediately and the stockholder will exercise it early only if he deems it to his advantage.

While the disproportion may not have been as great as the plaintiffs contend, there undoubtedly was a much greater contribution of book assets by the Zinc stockholders. But as the cases point out, the relative book value is not the dispositive factor. See *Borg v. International Silver Co.*, 11 *F. 2d* 147, 152 (2 *Cir.* 1925); *Evans v. Armour and Company*, 241 *F. Supp.* 705, 714 (*E. D. Pa.* 1965); *cf. 2 Bonbright, Valuation of Property* 816–823 (1937); *Bosland, Valuation Theories and Decisions of the Securities and Exchange Commission* 25, 86 (1964); see also *Bingham v. Savings Investment & Trust Co., supra,* 101 *N. J. Eq.,* at *p.* 423, where Vice Chancellor Backes noted that the exchange contemplated in the merger of going concerns "is not assets for assets, but share for share of capital stock, upon parity of value, and the measure of equality is the fair market value."

The plaintiffs allege that the Zinc minority contributed 50% of the earnings of the consolidated corporation but receive on conversion only 27.2% of the common stock. The record indicates that the earnings contributed by the Zinc minority may properly be viewed as 36% and while the 27.2% figure portrays the situation on conversion, it has already been noted that the Zinc minority stockholders may hold on to their preferred stock and will do so if they deem it to their benefit. The defendants acknowledge that a comparison of

Zinc earnings with those which might be advanced as attributable to the preferred stock would not be meaningful although they do suggest that a comparison of relative dividend rights may have some meaning. Over the last five years the cash dividends paid on Zinc common averaged about 70½ cents per share; as a result of the merger the .425 preferred G & W share for each Zinc share became entitled to a preferred annual dividend of $1.49. In his comments on the preferred stock, Judge Waugh noted below that its fixed rate of dividend "will equal the highest paid by Zinc in its history to date."

During the trial the plaintiff Brundage challenged G & W's mode of financing and voiced objections which he termed to be philosophical. He was disturbed by the proceedings which he considered to be damaging to Zinc stockholders because, as he phrased it, G & W did not put up any of its own resources to obtain control of Zinc which had "three times its equity" but put up borrowed funds which came "from bank deposits of the public." Some of us may be similarly disturbed but this appears to have little bearing here on the legal issue of whether the merger terms themselves afforded fair and equitable treatment to the Zinc minority. On that issue Judge Waugh acknowledged the disparities in assets and earnings but concluded that while they were factors to be carefully considered, they were outweighed by the many other factors in the case supporting a finding that the merger furnished fair and equitable treatment to those attacking it. Cf. *Bingham v. Savings Investment & Trust Co., supra,* 101 N. J. Eq., at *pp.* 422–424.

The sincere and well-reasoned presentation by McCann was of course a most significant factor. McCann had been with Zinc for almost fifty years and had been its president since 1951. His integrity and independence were unquestioned and his testimony was fully credited by the trial court. He considered the merger to be desirable from Zinc's standpoint and the treatment of the Zinc minority, for whom he obtained important protective concessions during negotiations,

to be entirely fair and equitable. He referred to the cyclical nature of Zinc's earnings in contrast to G & W's steady earnings and growth, to the diversification and stability which he had long sought and which he believed the merger would achieve, and to the benefits which Zinc would receive from its association with the younger and highly competent G & W management personnel. McCann and other independent directors of Zinc held substantial blocks of Zinc stock and were among the minority Zinc stockholders who voted heavily in favor of the merger.

Judge Waugh found on the basis of ample testimony that G & W's purchase of the controlling block of Zinc stock from the Hain group was "an arm's length transaction in good faith." The price paid for the controlling stock was $40 per share and the merger was very fairly designed to afford the Zinc minority at least that amount per share. Immediately before the announcement of the merger, Zinc stock was being sold on the New York Stock Exchange at $37.75 per share whereas at the time of the trial it was being sold at $49. In *Bingham v. Savings Investment & Trust Co., supra,* where a bank merger was sustained, the court pertinently referred to the benefits from the combination of the corporate strengths as having been "reflected in the sharp advance in the market value of the stock." 101 *N. J. Eq.,* at *p.* 424.

Although the Zinc directors made their own determination that the merger terms were fair to the minority, they had the firm support of expert advice from responsible financial concerns. Kidder, Peabody, which had been retained by G & W, along with White, Weld and Standard Research Consultants, which had been retained independently by Zinc, expressed the view that the new preferred share would sell at a price equivalent to more than the $40 per share paid to the Hain group. Kidder, Peabody and White, Weld also voiced their judgment that the terms of the merger were fair to the Zinc minority and at the trial their representatives testified to that effect. The preferred stock carries incidents which are of advantage to the Zinc minority; thus each share

is entitled to a preferential dividend of $3.50, upon liquidation it is entitled to a preferential payment of $100 per share plus accrued dividends, and at the option of the holder each share may be converted into 1.25 shares of common.

At the trial the plaintiffs advanced various subordinate contentions which were adequately discussed by Judge Waugh and need not be dealt with here. His crucial finding that the treatment of the Zinc minority was fair and equitable was understandably influenced in major part (1) by the market value evidence indicating that the minority had fared very well financially, (2) by the expert testimony of representatives of reputable financial houses indicating the overall fairness of the merger terms to the Zinc minority, and (3) by the testimony of McCann and others indicating that the Zinc board had acted independently, conscientiously, and reasonably in recommending the merger as being for the best interests of Zinc and all of its stockholders. There is no inflexible test as to what fairness is and the particular circumstances in each case will necessarily be controlling. Surely the finding here at the trial level may commonsensibly be viewed as within bounds on the record made by the parties. In any event and on a balance of all of the equities, we are not moved to disturb the merger at this stage in the progression of events. The judgment of dismissal is in all respects:

Affirmed. No costs.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.