280 N.J. Super. 223 (1995)
655 A.2d 76
STANLEY SZYMCZAK AND WENDY SZYMCZAK, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
ANTHONY LAFERRARA AND MRS. LAFERRARA, HIS WIFE, DEFENDANTS-RESPONDENTS, AND LAWYERS TITLE INSURANCE CORPORATION, INTERVENOR-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 14, 1994.
Decided February 27, 1995.
*224 Before Judges KING, MUIR, Jr. and EICHEN.
J. Peter Sokol, Co-counsel, argued the cause for appellants (McOmber & McOmber, attorneys; Mr. Sokol, of counsel and on the brief).
Steven P. Russo, Co-counsel, argued the cause for appellants (Mr. Russo, on the brief).
Frank J. Dupignac, Jr., argued the cause for respondents (Hiering & Dupignac, attorneys; Mr. Dupignac, on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
This is a trespass case precipitated by a substantial encroachment, about nineteen feet, by Stanley and Wendy Szymczak's home on the neighboring undeveloped sixty-foot-front lot of Anthony LaFerrara. The judge granted a mandatory injunction to LaFerrara and ordered the Szymczaks to remove their encroaching home. The judgment was stayed pending this appeal. We find the injunction inequitable in the circumstances. We reverse and remand for a plenary hearing to establish the fair market value of LaFerrara's vacant lot and his other provable consequential damages in lieu of injunctive relief.

*225 I
In 1970 LaFerrara purchased his vacant lot on Oceanic Drive in Dover Township, Ocean County for $3,500. This rectangular-shaped lot had a sixty-foot frontage, a 100-foot depth, and was a conforming, buildable lot. LaFerrara had been an employee of the Department of Community Affairs for about eleven years at the time of trial in August 1993. He testified that before this employment he had been a plumbing and building contractor. He bought the lot because he planned to build a house there and sell it some day. He had never listed the property for sale. His building plans were never precise but he did obtain construction and site plans from an architect in about 1982. He never proceeded further with any firm construction efforts.
LaFerrara considered the lot essentially in inventory for "you know, a speculation house." He had paid the taxes for over twenty-three years, a total of about $6,900 by 1993, or an average of about $300 a year. Taxes were $550 in 1993. He estimated his investment expenses at about $2,000, in addition to the purchase price, for various fees, surveying and title insurance.
LaFerrara knew nothing of the encroachment until February 1992. He lived in Cranford and had not visited the property during the time Szymczak was building or after completion.
In 1981 Stanley Szymczak, then single, purchased the adjacent, vacant lot to the west of LaFerrara's lot on Oceanic Drive. The record does not disclose what Szymczak paid for the lot. He also bought a title insurance policy at that time. Szymczak's rectangular-shaped lot had about an eighty-foot-front and was 100-feet deep. In 1986 Szymczak, by then married, began to build the house on his vacant lot. Before beginning the foundation work himself, Szymczak obtained and relied upon a survey which erroneously indicated that the house, as proposed and commenced, was within his lot's purported boundary lines.
In 1987 Szymczak obtained a bank loan of $60,000 to finance the remaining construction on the house. Szymczak had purchased *226 the basic plans for the house and altered them himself. He acted as his own general contractor and did the electrical and interior finish work himself. The Szymczaks and their two children have lived in their home since 1987.
The bank required a new survey in 1987. This new survey showed an apparent overlap of Szymczak's true boundary line onto two lots to the rear of his lot, owned by the O'Kanes and the Reisens. The Szymczaks then filed this action in 1987 in the Law Division to settle the location of their rear boundary line. A number of defendants were named but LaFerrara was not originally joined. Boundary line commissioners were appointed and their February 6, 1992 survey first revealed the encroachment onto LaFerrara's lot. Szymczak then amended this complaint to add LaFerrara as a party defendant.
In March 1992 the commissioners issued their final report settling all boundary lines. In May 1992 a consent order was entered which stated that the litigation had been settled among all parties with the exception of LaFerrara's claim arising from the nineteen-foot encroachment by Szymczak's house upon his lot. The order granted LaFerrara the right to file a counterclaim for the encroachment. LaFerrara then filed this counterclaim demanding an injunction compelling the Szymczaks to remove their home from his lot. In October 1992 Lawyers Title Insurance Company entered the litigation. Lawyers Title had issued title policies to both Szymczak in 1981 and LaFerrara in 1970.
The bench trial began in August 1993; the Szymczaks accepted the burden to present "proofs as to why the encroachment should not be removed," notwithstanding the fact that LaFerrara sought the injunctive relief. After the Szymczaks rested, LaFerrara successfully moved to strike the opinion on value by Szymczak's expert, Nicholas Monte, who testified that the market value of LaFerrara's lot in 1992, based on ten "comparable" sales of vacant residential lots, was $24,000 without the encroachment. The judge struck Monte's testimony because there had been no "independent verification" by him of the comparable sales data which the judge *227 thought was required by N.J.S.A. 2A:83-1 and N.J. Sports & Exposition Auth. v. Cariddi, 84 N.J. 102, 417 A.2d 529 (1980). Even if his testimony had been admitted, the judge alternatively found that she would not rely on it anyway because it was "unverified."
At the trial, the Szymczaks admitted that after completion their house and the surrounding landscaping, which included railroad ties, encroached about nineteen feet onto LaFerrara's lot. The Szymczaks also admitted that before the encroachment LaFerrara had a "buildable lot" which now was rendered a "hundred percent diminished in value" as undersized and unbuildable, even if capable of subdivision. LaFerrara stipulated to the admission into evidence of two estimates and a report by Gene Brower, a general contractor, in lieu of testimony. Brower thought it "very impractical and cost prohibitive" to pick up Szymczak's house, move it from LaFerrara's lot, and resite it on the Szymczak's lot. He estimated costs of $16,500 to demolish the house and $164,000 to reconstruct a comparable new house on the Szymczak's lot. By stipulation, defendant put into evidence the report of Sequoia Construction Company which estimated a cost of $88,000 to pick up the house and relocate it properly on the Szymczak's lot.
The Szymczaks acknowledge that there was no evidence that LaFerrara had any actual knowledge that a house was being built on part of his vacant lot in 1986-1987. They agree that LaFerrara could not have known this until the commissioners' determination issued in 1992. Defendant lived in Cranford in Union County, over fifty miles from this Ocean County property.
The judge concluded that both sides were "innocent" and had been "astounded by the Board of Commissioners' 1992 survey" revealing the encroachment. Because there was no admissible evidence from which the judge could assess the market value of LaFerrara's lot before the trespass, the judge concluded that the Szymczaks failed to prove that their proposed money-for-land remedy was "available to the court." The judge ordered the Szymczaks to remove their house and to restore the lot to its pre-encroachment *228 status. The Szymczaks and Lawyers Title now appeal.

II
The Szymczaks claim that the judge erred in ignoring at least three cases "almost directly on point" which justify their position that the judge should have ordered LaFerrara to sell them his entire sixty-by-one-hundred-foot lot for fair value. The Szymczaks rely on Billerman v. Basiak 47 N.J. 226, 220 A.2d 105 (1966); McKelway v. Armour, 10 N.J. Eq. 115 (Ch. 1854), and Riggle v. Skill, 9 N.J. Super. 372, 74 A.2d 424 (Ch.Div. 1950), aff'd o.b., 7 N.J. 268, 81 A.2d 364 (1951); see also Magnolia Construction Co. v. McQuillan, 94 N.J. Eq. 736, 121 A. 734 (E. & A. 1923), and Friel v. Turk, 95 N.J. Eq. 425, 123 A. 610 (Ch. 1924). These cases all suggest that a remedy short of a mandatory injunction destroying the encroaching improvements may be available to resolve the problem where improvements are constructed in whole or in part on the wrong lot.
We agree with the Szymczaks that these cases do support less extreme remedies, such as damages or imposed easements or lot swaps, which do not result in destruction of the improvements. But, in deference to LaFerrara's contentions, these holdings all seem to require either a mutual mistake, not a unilateral mistake, or some inequitable conduct by the party seeking the injunction. Concededly, in the case before us, there was no mutual mistake: the Szymczaks made an innocent mistake, triggered by their careless surveyor. LaFerrara was not mistaken, at fault or guilty of inequitable conduct in any respect.
We perceive that the question before us then is whether, in these circumstances, with two innocent property owners gulled through one party's careless surveyor, we must affirm the injunctive judgment compelling removal of the Szymczaks' home. There is much to say for LaFerrara's position. There is no evidence that defendant had actual or constructive knowledge of the construction of the Szymczaks' house and remained silent. For that *229 matter, there is no evidence that defendant, prior to 1992, had any knowledge that plaintiffs had even constructed a house. Nor is there any evidence of mutual mistake, in the sense that during the construction of the house, the Szymczaks and LaFerrara labored under the same illusion at the same time. See Giammares v. Allemannia Fire Ins. Co., 91 N.J. Eq. 114, 119, 108 A. 237 (E. & A. 1919); Green v. Stone, 54 N.J. Eq. 387, 396-97, 34 A. 1099 (E. & A. 1896); Biliunas v. Balassaitis, 115 N.J. Eq. 440, 443, 171 A. 319 (Ch. 1934).
While the Szymczaks may have constructed their house under the mistaken belief that it was entirely upon their lot, there is no evidence that, during the construction of this house, LaFerrara entertained any belief, mistaken or otherwise, about the location of this house vis-a-vis the boundary line of his vacant lot. In this respect, the cases relied on by the Szymczaks are factually distinguishable from this situation before us. Those cases do not mandate an order compelling LaFerrara to sell his entire lot to the Szymczaks simply to correct the mistake apparently made by the Szymczaks' surveyor, a mistake LaFerrara had "nothing to do with."
Nonetheless, we find little justification for the order requiring the Szymczaks to destroy their home to preserve LaFerrara's 6000-square-foot undeveloped lot which he had held for over twenty years for speculative development. In this circumstance, we are satisfied that an adequate award of money damages best adjusts the interests of the parties and accomplishes the ends of justice. There surely is nothing unique about this 60-by-100-foot vacant lot. The record clearly demonstrates that LaFerrara had no special personal purpose in mind for developing the lot.
We conclude that the situation calls for the application of the "relative hardship" doctrine embodied in the Restatement (Second) of Torts § 941 (1979).[1] This doctrine calls for a "balancing *230 of the equities," even where the action is for trespass to real property, and especially where money damages are relatively adequate. Id. at § 944.[2] The doctrine is particularly appropriate where both parties are personally blameless, an injunction works a great hardship on the encroacher, and money damages suffice for the victim. Id. at § 941 comments a, b, c. The Restatement cautions that "an injunction should not be issued merely because of the existence of a technical tort," id. at comment c, and that the doctrine "expresses a compromise between the conflicting interests of neighbors, in which many harms must be borne as incidents of communal life." Ibid. As to damages, the Restatement counsels that the damage remedy may well be quite adequate in "a case of dispossession of land by an encroaching building" where "there is a market that affords a standard of values, sale value or rental value, by which to measure damages and inadequacy of the remedy does not arise from any uncertainty." Id. at § 944, comment d.
The "relative hardship" or "balancing of equities" doctrine has found certain favor in several of our reported cases involving *231 interests in real property. In Gilpin v. Jacob Ellis Realties, Inc., 47 N.J. Super. 26, 135 A.2d 204 (App.Div. 1957), the doctrine was invoked in an action by an adjoining property owner to compel the defendant to remove portions of a building erected on its premises in violation of a restrictive covenant. The doctrine was invoked by this court because of disproportionate remodeling expense and rental loss which would be inflicted upon the defendant if an injunction issued. An award of $1,000 in damages was affirmed as adequate for breach of the covenant. Correction of the encroachment would have cost $11,500 plus an unspecified loss of rental income.
In denying injunctive relief, in Gilpin, Judge Clapp for this court stressed that a plaintiff is not entitled to injunctive relief "as of course" but that the allowance of such "is a discretionary matter, in that the court may be called upon to give or withhold relief depending upon variables, namely the circumstances of the case." Id. at 29, 135 A.2d 204. Such variables may include the wanton or intentional character of a defendant's conduct, laches, and the comparative fault of the parties. Gilpin recognized that "the Restatement [§ 941] and the decided weight of authority in other jurisdictions do sustain the doctrine." Id. at 33, 135 A.2d 204. The disproportion must be "of considerable magnitude" and not slight before the doctrine is considered. Id. at 34, 135 A.2d 204. The doctrine is "particularly applicable" to a situation where commercial, rather than personal, interests are involved in denying injunctive relief  where "the pleasure that may be secured in the enjoyment of an equitable servitude of a certain type, is in no way involved." Id. at 35, 135 A.2d 204. This concept is highly pertinent to the case before us. LaFerrara always viewed the 6000-square-foot vacant lot as an investment opportunity, never, for instance, as a potential personal retirement or vacation site. Gilpin has been cited favorably twice by our Supreme Court, see Brundage v. New Jersey Zinc Co., 48 N.J. 450, 465, 226 A.2d 585 (1967); Tide-Water Pipe Co. v. Blair Holding Co. Inc., 42 N.J. 591, 600 n. 4, 202 A.2d 405 (1964), and recently by this court. *232 Kline v. Bernardsville Assoc., Inc., 267 N.J. Super. 473, 479, 631 A.2d 1263 (App.Div. 1993).
Gilpin has found recent currency in the concurring opinion of Justice Pollock, joined by Justice Clifford, in Davidson Bros. v. D. Katz & Sons, Inc., 121 N.J. 196, 220, 579 A.2d 288 (1990), which was an action to enforce a noncompetitive covenant, allegedly binding on all subsequent property owners, not to operate a grocery store or a supermarket.
The opinion of the Supreme Court remanded the case for a full hearing on whether enforcement of the covenant not to compete was reasonable under an eight-factor formula. Id. at 211-12, 579 A.2d 288. Justice Pollock's concurrence urged that the remand be limited to compensatory damages as the only "fair result." Id. at 235, 579 A.2d 288. As Justice Pollock described, the "case presents a tension between two worthy objectives: the continued operation of the supermarket for the benefit of needy citizens [in inner-city New Brunswick], and the enforcement of the covenant." Id. at 221, 579 A.2d 288. He concluded that "an award of damages rather than the grant of an injunction would permit the realization of both objectives." Id. Relying in part upon Gilpin, the two-judge concurrence (of six judges sitting) urged that under its solution the plaintiff will obtain redress  it will be "given what plaintiffs are given in many types of cases  relief measured so far as the court may reasonably do so, in damages." Id. at 235, 579 A.2d 288 (citing Gilpin, supra, 47 N.J. Super. at 34, 135 A.2d 204). The concurrence also expressly recognized that the roots of the injunction tradition "are buried deep in the English common law and are not suited for modern American commercial practices," and that "the unswerving preference for injunctive relief over damages is an anachronism." Davidson Bros. v. D. Katz & Sons, supra, 121 N.J. at 233, 579 A.2d 288.
Certainly, a court could reasonably measure LaFerrara's damages for loss of his vacant lot, including his anticipated profits, through development, if any are reasonably expected in this situation, as readily as a court could measure the Davidson *233 Brothers' loss of profits through the violation of its restrictive covenant against competition. Other more recent decisions relying upon the Restatement's § 941 doctrine of "relative hardship" to deny injunctions and award money damages in encroachment cases include Stuttgart Electric Co., Inc. v. Riceland Seed Company, 33 Ark. App. 108, 114-15, 802 S.W.2d 484, 487-88 (1991), and Ostrem v. Alyeska Pipeline Service Co., 648 P.2d 986, 989 (Alaska 1982).
On this record, we are convinced that the doctrine of relative hardship furnishes the fairest result. LaFerrara's measurable damages for loss of the lot are obviously quite disproportionate in dollars or degree of harm to removal and relocation or reconstruction of the Szymczak's family's home. We remand for a hearing on the issue of LaFerrara's damages, including the value of his fee estate at the time of the onset of the encroachment 1986-1987, interest from that date, and his consequential damages, if any can be proven, including his payment of taxes after the encroachment date and any probable loss of profits. As our Supreme Court has observed in another trespass damage context, a plaintiff is permitted "to assert a claim for whatever damages the facts may lawfully warrant, unrestrained by common law pleading or nomenclature." Marder v. Realty Construction Co., 43 N.J. 508, 511, 205 A.2d 744 (1964).
The judgment for a mandatory injunction in LaFerrara's favor is reversed; the matter is remanded for trial on the issue of LaFerrara's damages from the time of the encroachment in 1986-1987.
NOTES
[1] Section 941 states:

The relative hardship likely to result to the defendant if an injunction is granted and to the plaintiff if it is denied, is one of the factors to be considered in determining the appropriateness of injunction against tort.
[2] Section 944 states:

(1) The relative adequacy of the damage remedy for tort as compared with the remedy of injunction, depends, insofar as its compensatory function is concerned, upon
(a) the nature of the interests harmed,
(b) the effects of the rules of law governing the measure of damages,
(c) the availability and persuasiveness of evidence bearing upon the assessment of damages,
(d) the effects of resort to measures of self-help,
(e) the cost of assessing damages, and, in the case of repeated or continuing torts, the cost of a multiplicity of suits,
(f) the collectibility of the judgment, and
(g) other pertinent factors
(2) In a situation in which its compensatory function is defective, the damage remedy may still be regarded as relatively adequate on the basis of its declaratory, emotional and punitive functions.