2014 COA 136

James M. GRAHAM and Nichole J. Graham, Plaintiffs-Appellants,

v.

JULES INVESTMENT, INC., and Big Cats of Serenity Springs, Inc., d/b/a Serenity Springs Wildlife Center, Defendants-Appellees.

**Court of Appeals No. 13CA1364**

Colorado Court of Appeals,
Div. VI.

Announced October 9, 2014

Rehearing Denied November 13, 2014

Hamilton Faatz, PC, Clyde A. Faatz, Jr., Andrew C. Iverson, Greenwood Village, Colorado, for Plaintiffs–Appellants

Gregory John Hock, P.C., Gregory John Hock, Colorado Springs, Colorado, for Defendants–Appellees

Opinion by JUDGE BERNARD

¶ 1 Can a court order a land owner to sell the land to another if the other's structures encroach on the land? We recognize that this remedy, which is called a "forced sale," should be used sparingly in encroachment cases. But, under the unusual facts of this case, we conclude that such a remedy was proper.

¶ 2 This appeal involves a refuge that harbors exotic animals. It is owned by defendants, Big Cats of Serenity Springs, Inc., d/b/a Serenity Springs Wildlife Center, and Jules Investment, Inc. The animals live in structures that are surrounded by fences.

¶ 3 The trial court determined that some of the refuge's animals and their keepers trespassed on 1.7 acres owned by plaintiffs, James M. Graham and Nichole J. Graham. As a remedy, the trial court ordered

- plaintiffs to sell the 1.7 acres, which contained some of the structures and fences housing some of the exotic animals, to defendants for $5780;
- defendants to pay all fees and costs associated with this sale; and
- defendants to pay plaintiffs $1737 to assist them in applying for a waiver that would allow plaintiffs to employ their property for agricultural uses.

¶ 4 We conclude that the court did not err in its analysis of plaintiffs' trespass and encroachment claim. We also conclude that this remedy was within the trial court's discretion. We therefore affirm.

I. Background

A. The Property

¶ 5 Serenity Springs Wildlife Center is a ten-acre wildlife refuge located in El Paso County. It was established by Nicholas and Karen Sculac in the mid–1990s. In 1999, the Sculacs formed a Colorado nonprofit corporation—Big Cats of Serenity Springs, Inc.—to manage it. The refuge houses about 140 tigers, lions, and other exotic animals. Many of these animals are threatened or endangered species.

¶ 6 The refuge obtained these animals as "rescues" from other animal sanctuaries around the country that have gone out of business. It derives its income from visitors' fees and private donations. It has some paid staff and also uses volunteers.

¶ 7 The refuge was once part of a 320–acre parcel of land that Mrs. Sculac acquired in 1993. In 1997, after Mr. Sculac erected the perimeter fence enclosing the refuge, Mrs. Sculac recorded a deed that severed the refuge from the original parcel. And, in 1998, she recorded another deed that severed another 36.5-acre parcel from the original parcel. This 36.5–acre parcel is directly south of, and shares a common boundary with, the refuge. The Sculacs built their home on this parcel. The home is located about 1000 feet from the refuge.

¶ 8 The record reveals that, beginning in 2000, the Sculacs and their property went through cycles of foreclosure and reacquisition. Lenders foreclosed the Sculacs' home and the 36.5-acre parcel in 2000. The Sculacs reacquired the parcel and the home in 2003 after the property had passed through several hands. They lost their home and the parcel again in 2006, the year that Mrs. Sculac died. The lender sold the home and the parcel, and the buyers eventually sold it to the plaintiffs in 2010.

¶ 9 The Sculacs lost the refuge to foreclosure in 2001, but they got it back in 2004.

Mr. Sculac sold it to third parties in 2007; he reacquired it later that year; and a lender foreclosed it in 2008.

¶ 10 The lender sold it to Julie Walker in 2009. She conveyed it to a corporation, Jules Investment, Inc. She also married Mr. Sculac in 2010.

### B. The Survey

¶ 11 The plaintiffs did not have the 36.5–acre parcel surveyed when they bought it in 2010. But they hired a surveyor in 2012 who told them that a piece of the refuge, which consisted of 1.7 acres that was surrounded by a fence, was on the plaintiffs' 36.5–acre parcel. The fence enclosed pens and concrete lion and tiger dens. The footings for these structures were sixteen-inch-wide concrete slabs that were buried two to four feet into the ground. About nineteen lions and tigers lived on the 1.7 acres.

¶ 12 (The refuge had also been using about one acre on the 36.5–acre parcel as a dump. The trial court ordered plaintiffs to remediate the dump and to return it to the defendants. Neither party appeals that decision.)

¶ 13 The following diagram shows the approximate relative relationship of the properties that we have described above. This diagram is for illustrative purposes only, and it is not drawn to scale.

### C. The Lawsuit

¶ 14 Plaintiffs sued defendants for trespass and nuisance. They withdrew their nuisance claim, and they moved for summary judgment on the trespass claim. The trial court initially entered summary judgment for plaintiffs. But the court later granted defendants' motion to reconsider its ruling, and it then entered summary judgment for defendants.

¶ 15 The trial court concluded in the second summary judgment order that the "structures alone" were not a trespass. But it decided that the use and presence of the structures "deprive[d] ... plaintiffs of the use of" 1.7 acres of their 36.5–acre parcel and "facilitated a regular, if not continuing trespass" of the refuge's staff on that part of their property.

¶ 16 The court then held a hearing to determine the appropriate remedy. Defen-

dants asked the court to allow them to purchase the 1.7 acres from plaintiffs. They claimed that removing the structures and rebuilding them somewhere else would create a severe hardship. Mr. Sculac and Ms. Walker testified, and they made three basic points.

¶ 17 First, Mr. Sculac is a contractor, and he built all the refuge's structures, the house, and the perimeter fence. He built the refuge's perimeter fence before Mrs. Sculac severed the 36.5–acre parcel from the original parcel. And he built all the structures when the Sculacs owned both parcels.

¶ 18 Second, although he hired a surveyor to establish the perimeter fence as the dividing line between the 36.5–acre parcel and the refuge's parcel, the surveyor "evidently didn't do it right." The first time he learned about the true dividing line between the 36.5–acre parcel and the refuge's parcel was when plaintiffs filed this lawsuit.

¶ 19 Third, the refuge did not have enough money or room elsewhere on the parcel to move the tigers and lions from the 1.7 acres. It would have cost about $38,400 to remove the structures from the 1.7 acres and about $210,000 to rebuild the cages elsewhere to conform to a new height requirement for the fencing that the federal government had imposed. And the refuge was operating at a net loss.

¶ 20 County set-back requirements left little or no room for such construction. No one else was willing to take the big cats, and defendants would have had to euthanize some of the animals that were endangered or threatened species.

¶ 21 Plaintiffs asked the court to order defendants to remove the fences and the animal pens and to restore the property to its "natural state." One of the plaintiffs testified that they wanted to raise livestock on the 36.5–acre parcel, to use the well on the property to water the livestock, and to build a shop.

¶ 22 But, according to plaintiffs, these uses might have been stymied if the size of the parcel fell below thirty-five acres because El Paso County zoning regulations set the floor for the size of agricultural use parcels at

thirty-five acres. A representative of the El Paso County Attorney's office wrote in a letter that the county could not issue any building permits or approve any land use applications for the plaintiffs' parcel "unless relief from the minimum lot size requirement were granted." The letter indicated, however, that such "relief" was possible: "due to the size of the [plaintiffs'] parcel, it would qualify for administrative relief which currently carries a $1737 application fee."

¶ 23 The trial court then decided that requiring defendants to vacate the 1.7 acres would "create a grave hardship" for them. It decided that it would remedy the trespass by the animals and their keepers on the 1.7 acres with injunctive relief. The court concluded that the "unique and unusual facts" of this case "support[ed] the extraordinary and non-favored judicial remedy of a forced sale of the [ 1.7 acres]" to defendants. It ordered plaintiffs to convey the 1.7 acres to defendants in exchange for $5780, which was the value of the 1.7 acres according to plaintiffs. And the court ordered defendants to pay plaintiffs an additional $1737, which was the amount of the application fee for obtaining a waiver from the 35–acre requirement from El Paso County.

### D. Plaintiffs' Arguments on Appeal

¶ 24 Plaintiffs contend on appeal that the trial court erred when it found that the structures by themselves did not constitute a trespass and an encroachment. Alternatively, they argue that, if the structures did not constitute a trespass and an encroachment, then the court erred when it considered the cost of their removal in its balance of the relative hardships between the parties. They also contend that the court abused its discretion when it ordered them to sell the 1.7 acres to defendants. And they contend that the trial court's order requiring them to sell their 1.7 acres to defendants amounted to an unconstitutional taking of land by the state for a private purpose.

¶ 25 We disagree with these contentions for the following reasons.

### II. Trespass and Encroachment

¶ 26 Plaintiffs contend that the trial court should have determined that the structures constituted a trespass and an encroachment because the refuge's tigers, lions, and keepers continued to occupy the structures. They argue that the "unauthorized continued use" of the 1.7 acres was a "continuing trespass." They assert that, if the trial court concluded that the trespass was "continuing," it was required to issue a "mandatory injunction" ordering defendants to "remove the fences and pens" from the 1.7 acres. And they submit that the trial court's failure to do so will result in plaintiffs' having "to file a multiplicity of lawsuit[s] to remedy each ... trespass as it arises repeatedly."

¶ 27 For the following reasons, we do not need to address the distinction that the trial court drew between "regular" and "continuing" trespass, or between encroaching structures and trespassing animals and keepers.

¶ 28 First, the court determined that there *had been* a trespass, and that it therefore needed to craft a remedy. Plaintiffs have not cited any case, and our research has not discovered one, that would mandate one type of remedy over another for (1) a "regular" trespass, as opposed to a "continuing" trespass; or (2) encroaching structures, as opposed to trespassing animals and keepers within those structures.

¶ 29 Second, although a mandatory injunction requiring a trespasser to remove encroaching structures is the "[o]rdinar[ ]y" remedy for continuing trespass, it "is not to be issued as a matter of course." *Golden Press, Inc. v. Rylands*, 124 Colo. 122, 125, 235 P.2d 592, 594 (1951). And because there is "no specific and universally-accepted rule," *id.* at 126, 235 P.2d at 595, about the kind of remedy a court should impose in these types of cases, the court must consider "the peculiar circumstances of each encroachment case" to determine whether "removal of the improvements" or "damages" is the more "appropriate" remedy, *McDowell v. United States*, 870 P.2d 656, 661 (Colo.App.1994).

¶ 30 Third, it is not necessary to remove the structures because the trial court's remedy—sale of the 1.7 acres to defendants—"eliminates the need of [plaintiffs] to file a multiplicity of lawsuit[s] to remedy each ... trespass as it arises repeatedly." Once defendants transfer the 1.7 acres to defendants,

there will be no continuing trespass to remedy.

## III. The Remedy

### A. Standard of Review

¶ 31 Courts in equity have "considerable discretion in fashioning a decree that achieves a fair result under the particular circumstances of the case." *Hunter v. Mansell*, 240 P.3d 469, 477 (Colo.App.2010). Thus, we will not disturb "[t]he entry or denial of injunctive relief" unless the trial court abused its discretion. *Id.* A trial court abuses its discretion when it erroneously applies the law, or when its decision is manifestly arbitrary, unreasonable, or unfair. *Id.* We defer to the trial court's factual findings that are supported by the record, but we review any legal conclusions de novo. *Town of Erie v. Town of Frederick*, 251 P.3d 500, 502 (Colo.App.2010).

### B. The Law

¶ 32 If a person erects an encroaching structure with the "intention[ ]" of "taking ... another's land, equity may well require" restoring the land to the other person without regard to "the expense of removal as compared with the damage suffered therefrom." *Golden Press*, 124 Colo. at 126, 235 P.2d at 595. But if the encroachment occurs "in good faith," a court should consider the "relative hardship[s]" that each party will face "so that it shall not act oppressively." *Id.* at 126, 129, 235 P.2d at 595, 596 (Where the underground footings of defendant's building encroached three inches onto the plaintiffs' property, the trial court's order requiring that the footings be removed was "unconscionable" because "[t]he expense and hardship of such removal would be so great in comparison with any advantage of plaintiffs to be gained thereby.").

¶ 33 Although *Golden Press* involved a "slight" encroachment, *id.* at 126, 235 P.2d at 592, our supreme court, contrary to plaintiffs' argument, did not hold that trial courts must order that anything other than a slight encroachment be removed. We recognize that Colorado's appellate courts have not yet encountered a case in which they concluded that equity required that property be sold to an encroacher. *See, e.g., Hunter*, 240 P.3d at 479–81 (reversing and remanding for entry of order requiring that the encroachment be removed; when encroacher bought her property, the encroaching "corrugated metal" shed had "no foundation" and the seller disclosed to her that the shed was encroaching onto the neighbor's property and may have to be removed due to an informal agreement with the neighbor). But neither the supreme court nor any division of this court has created a bright-line rule that would prohibit such a result.

¶ 34 Other authorities recognize that, "[a]lthough such a conclusion should not be reached lightly," under some circumstances "it would ... be fair to require a sale of the [property]." Dan B. Dobbs, *Dobbs Law of Remedies*, §§ 5.8(3), 5.10(4) (2d ed. 1993). "The dominant approach in the encroachment cases is to balance the relative hardships and equities and to grant or deny [an] injunction as the balance may seem to indicate." *Id.* at § 5.10(4). An injunction for removal "is to be withheld only when the hardship to the defendant is not only great[,] but disproportionate compared with the hardship or loss of rights the plaintiff would suffer if the structure is allowed to remain." *Id.* Where such injunction is denied, "the defendant in effect acquires either title or an easement in the land and pays damages accordingly." *Id. See also* Olivia Leigh Weeks, Comment, *Much Ado About Mighty Little— North Carolina and the Application of the Relative Hardship Doctrine to Encroachments of Permanent Structures on the Property of Another*, 12 Campbell L.Rev. 71, 74– 75 (Winter 1989)("Courts will deny equitable relief ... in favor of money damages if the encroachment was an innocent mistake [and] ... if the encroachment is slight compared with the injury to the defendant if he has to remove it.")

¶ 35 Decisions from other states apply these same principles. In *Szymczak v. LaFerrara*, 280 N.J.Super. 223, 655 A.2d 76, 78– 81 (N.J.Super.Ct.App.Div.1995), where the defendant built a home in reliance on an erroneous survey, the trial court's order to remove a home that encroached nineteen feet onto the adjoining 60 × 100 lot was reversed and remanded to order a sale of the entire 60

× 100 lot to the defendant. The court found that the plaintiff's lot was rendered "undersized and unbuildable," the plaintiff had held the lot for "speculation," and the plaintiff had "no special personal purpose in mind for developing" it. *Id.* A Washington court has "withheld as oppressive" an order requiring the removal of an encroachment where (1) the encroacher acted in good faith; (2) damage to the landowner "was slight" and "the benefit of removal [was] equally small"; (3) leaving the encroachment posed "no real limitation" on the "future use" of the landowner's property; (4) "it [was] impractical to move the structure as built"; and (5) "there [was] an enormous disparity in resulting hardships." *Arnold v. Melani,* 75 Wash.2d 143, 449 P.2d 800, 805–06 (1969). Under West Virginia law, "an improver of land owned by another, who through a reasonable mistake of fact and in good faith erects a building entirely upon the land of the owner, with reasonable belief that such land was owned by the improver, is entitled to recover the value of the improvements from the landowner and to a lien upon such property which may be sold to enforce the payment of such lien, or, in the alternative, to purchase the land so improved upon payment to the landowner of the value of the land less the improvements." *Somerville v. Jacobs,* 153 W.Va. 613, 170 S.E.2d 805, 813 (1969). And in *Soma v. Zurawski,* 321 Wis.2d 91, 772 N.W.2d 724, 731 (App.2009), the court upheld a "forced sale" of less than an acre of a seven-acre parcel upon which the adjoining landowner mistakenly built a trailer, landscaping, fence, septic system, and well because the cost of relocating the improvements would be "more than twice the value of the encroached land" and there was "no indication in the record that the encroached property was particularly valuable to the [plaintiffs]." *See also Hirshfield v. Schwartz,* 91 Cal.App.4th 749, 110 Cal.Rptr.2d 861, 867 (2001)(relying on the relative hardship doctrine to deny a request to enjoin a trespass caused by an encroachment, and applying a three-part test: Was the defendant's encroachment innocent as opposed to willful or negligent? Will the plaintiff suffer irreparable injury if the injunction is denied? Will enjoining the encroachment cause hardship to the defendant that is disproportionate to the hardship suffered by the plaintiff if the encroachment continues?); *Amkco, Ltd., Co. v. Welborn,* 130 N.M. 155, 21 P.3d 24, 26–30 (2001)(applying the relative hardship doctrine).

¶ 36 And, although there are "a few decisions [from other states] that refuse[d] to balance the hardships" and "issue[d] [an] injunction in the face of severe hardship[,] [t]hese more stringent views seem largely to have passed." Dobbs, § 5.10(4).

### C. Analysis

■ ¶ 37 We are persuaded by the authority in the preceding section holding that sale of the property can be a proper remedy in the appropriate case. Applying this authority, we conclude that the trial court did not abuse its discretion when it determined that the "unique and unusual facts" of this case "support the extraordinary and non-favored judicial remedy of a forced sale of the [ 1.7 acres] to defendants." *See Hunter,* 240 P.3d at 477.

¶ 38 First, contrary to plaintiffs' contention, the law supports the trial court's decision to consider the "relative hardships" of the parties. The record supports the court's finding that Mr. and Mrs. Sculac acted in "good faith" when they erected the structures on the 1.7 acres of the 36.5–acre parcel that was eventually conveyed to plaintiffs. This finding was based, in part, on the fact that the structures were built while the Sculacs owned both of the parcels and on Mr. Sculac's testimony that the Sculacs intended for the property line to be drawn at the perimeter fence. *See Golden Press,* 124 Colo. at 126, 235 P.2d at 595 (Where the encroachment occurs "in good faith," a court should consider the "relative hardship[s]" that each party will face "so that it shall not act oppressively.").

¶ 39 Second, the law supports the trial court's conclusion that "sale of the [property]," Dobbs, § 5.8(3), was an option because there is "no specific and universally-accepted rule" as to what kind of remedy a trial court may impose, and under some circumstances sale is a "fai[r]" remedy, *Golden Press,* 124 Colo. at 126, 235 P.2d at 595. And the trial court did not reach its conclusion "lightly." Dobbs, § 5.8(3).

¶ 40 Third, the record supports the trial court's conclusion that requiring defendants to vacate the 1.7 acres would "create a grave hardship" that would have been "disproportionate compared with the hardship or loss of rights ... plaintiff[s] would suffer if the structure[s] [are] allowed to remain." *See Town of Erie*, 251 P.3d at 502; *Hirshfield*, 110 Cal.Rptr.2d at 867; *Amkco, Ltd., Co.*, 21 P.3d at 28–29; Dobbs, § 5.10(4). The court based this conclusion on its findings that

- plaintiffs had "no special personal purpose in mind for developing" the 1.7-acres where defendants' structures were built, *Szymczak*, 655 A.2d at 79, and there is "no indication in the record that the encroached property" was "particularly valuable" to plaintiffs, *see Soma*, 772 N.W.2d at 731, because they did not know that the 1.7 acres were part of their property until the 2012 survey, and the 1.7 acres was located about 1000 feet away from the other improvements on their property;

- allowing defendants to purchase the 1.7 acres posed "no real limitation" on the "future use" of the remaining 34.8 acres of plaintiffs' property, *Arnold*, 449 P.2d at 806, even though the sale reduced the plaintiffs' property to less than 35 acres; the county attorney stated that plaintiffs' property "would qualify for administrative relief" with payment of an application fee; the court awarded plaintiffs the amount of the application fee on top of the value of the 1.7 acres; and plaintiffs' "understanding" that they might lose the right to use their well for future agricultural purposes was not supported by other evidence;

- the value of the 1.7 acres to plaintiffs was $5780, while the value of the 1.7 acres to the defendants was in the tens of thousands, if not hundreds of thousands, of dollars, *see Hirshfield*, 110 Cal.Rptr.2d at 867; *Amkco, Ltd., Co.*, 21 P.3d at 28–29; *Soma*, 772 N.W.2d at 727–28; if defendants had been required to vacate the 1.7 acres, they would have lost the structures they had there, and they would have had either to rebuild the structures somewhere else at great cost or euthanize some of their animals;

- the structures could not practically be "move[d] ... as built" because they were embedded into 16–inch–wide concrete footers that extend two to four feet into the ground, *Arnold*, 449 P.2d at 805–06;

- the cost of removing the structures—$38,400—was more than six times the value of the 1.7 acres without the structures, *see Hirshfield*, 110 Cal.Rptr.2d at 867; *Amkco, Ltd., Co.*, 21 P.3d at 28–29; *Soma*, 772 N.W.2d at 727–28; and, because the refuge had been operating at a "net loss," it was unlikely that defendants would be able to remove the structures and to continue to operate the refuge; and

- even if the trial court did not consider the cost of removing the structures in its analysis, the record would still support the finding of an "enormous disparity" between defendants' hardship and the plaintiffs' hardship if the defendants were required to vacate the 1.7 acres, *Arnold*, 449 P.2d at 806.

¶ 41 We will not address plaintiffs' constitutional takings contention because they did not raise it in the trial court. *See Beauprez v. Avalos*, 42 P.3d 642, 649 (Colo. 2002).

¶ 42 The judgment is affirmed.

JUDGE FOX and JUDGE MÁRQUEZ * concur.

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24-51-1105, C.R.S. 2014.